# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Hubbard Broadcasting, Inc.,

Civil No. 13-2649 (DWF/JJG)

Plaintiff,

v.

**MEMORANDUM
OPINION AND ORDER**

DIRECTV, Inc.,

Defendant.

---

Heather M. McElroy, Esq., Jan M. Conlin, Esq., Michael V. Ciresi, Esq., William Bornstein, Esq., Laura E. Nelson, Esq., Ochen D. Kaylan, Esq., and Thomas L. Hamlin, Esq., Robins Kaplan Miller & Ciresi LLP; and Joseph W. Anthony, Esq., and Daniel R. Hall, Esq., Anthony Ostlund Baer & Louwagie PA, counsel for Plaintiff.

Benjamin W. Hulse, Esq., and Jerry W. Blackwell, Esq., Blackwell Burke PA; and Melissa D. Ingalls, Esq., Michael E. Baumann, Esq., and Robyn E. Bladow, Esq., Kirkland & Ellis LLP, counsel for Defendant.

---

# INTRODUCTION

This matter is before the Court on a Motion for Partial Summary Judgment brought by Plaintiff Hubbard Broadcasting, Inc. ("HBI" or "Hubbard") (Doc. No. 99); a Motion to Stay Proceedings Pending Arbitration and to Compel Arbitration of Hubbard's Breach Claims Related to REELZ brought by Defendant DIRECTV, Inc. ("DIRECTV") (Doc. No. 52); a Motion to Dismiss Hubbard's First Amended Complaint brought by DIRECTV (Doc. No. 82); and a Motion for Summary Judgment on Hubbard's Breach of Contract and Declaratory Relief Claims brought by DIRECTV (Doc. No. 90). For the

reasons set forth below, the Court grants HBI's motion for partial summary judgment,

denies DIRECTV's motion for summary judgment, and declines, at the present time, to

rule on DIRECTV's motions to stay and dismiss.

## BACKGROUND

HBI is a family-owned television and radio broadcasting corporation with its

headquarters in St. Paul, Minnesota.  (Doc. No.119 ("McElroy Decl. II") ¶ 4, Ex. 2 ("S.E.

Hubbard Dep.") at 15.)  Stanley S. Hubbard is HBI's president, chairman, and CEO.  (*Id*.

at 8-9.)  In 1981, Stanley S. Hubbard founded satellite television company United States

Broadcasting, Inc. ("USSB").  (Doc. No. 102 ("McElroy Decl. I") ¶ 4, Ex. 2 ("S.E.

Hubbard Decl.") ¶ 3.)[1]  USSB was the first Federal Communications Commission

("FCC") permittee authorized to build and operate a direct broadcast satellite ("DBS")

television business.  (*Id*.)  Roughly a decade after USSB was first awarded its FCC

license, USSB and DIRECTV entered into a partnership to jointly build and launch a

high-power direct broadcast satellite and operating system.  (S.E. Hubbard Dep. at 15;

McElroy Decl. ¶ 5, Ex. 3 ("Hartenstein Dep.") at 11.)[2]  The satellite became operational

in 1994, and USSB and DIRECTV began broadcasting in the United States.  (Hartenstein

Dep. at 11.)

---

[1]     Stanley E. Hubbard, who is Stanley S. Hubbard's son, is the current Vice
President of HBI and CEO of REELZ Channel.  (S.E. Hubbard Dep. at 8.)

[2]     Despite their partnership in launching a satellite system, USSB and DIRECTV
were competitors in the DBS industry.  (S.E. Hubbard Dep. at 15.)

In 1998, USSB and Hughes Electronic Corporation ("Hughes") entered into merger discussions.  (Doc. No. 74, First Am. Compl. ("FAC") ¶ 21.)  The idea of a merger was raised by DIRECTV and Hughes.  (S.E. Hubbard Dep. at 11, 183-84; Hartenstein Dep. at 17.)  At the time, HBI was the majority shareholder of USSB and DIRECTV was a subsidiary of Hughes.  (FAC ¶¶ 18, 19.)  Also at the time, USSB had exclusive distribution arrangements with premium movie channel packages, HBO and Showtime.  (FAC ¶ 21; Hartenstein Dep. at 17-18, 22-25.)  DIRECTV did not have such distribution agreements and could not offer its customers access to such premium channels via its satellite network.  (Hartenstein Dep. at 12-13, 17-18.)  DIRECTV felt access to HBO and Showtime was necessary to compete.  (*Id.*)

The negotiations leading up to the merger were primarily between S.E. Hubbard and DIRECTV's former president Eddy W. Hartenstein ("Hartenstein").  (S.E. Hubbard Dep. at 10-11; Hartenstein Dep. at 58-59.)  The parties also negotiated a long-term programming development agreement for carriage on DIRECTV.  (Doc No. 94 ("Campbell Decl.") ¶ 3 (May 20, 1999 Agreement (the "Preferred Programming Agreement" or "PPA"); FAC ¶ 1, Ex. A ("PPA"); *see also* S.E. Hubbard Dep. at 25-26.)[3]

HBI was open to the idea of a merger, so long as it could retain a substantial role in the DBS business.  (S.E. Hubbard Dep. at 186; Hartenstein Dep. at 22, 31-32; S.E. Hubbard Decl. ¶ 52.)  S.E. Hubbard testified that HBI would not have agreed to the

---

[3]   The parties do not dispute that the PPA "shall be governed by and construed in accordance with" California law.  (PPA § 3(b).)

merger without a long-term programming agreement.  (S.E. Hubbard Dep. at 37.)  HBI

has submitted evidence that the reason HBI entered into the PPA was to ensure that the

Hubbard Family would be able to invest in the business for "generations."  (S.E. Hubbard

at 23.)  Hartenstein testified that he understood that HBI was a family business and that

HBI wanted it to continue as a family business on the programming side.  (Hartenstein

Dep. at 31.)  Indeed, Hartenstein testified that he was told that HBI would only agree to a

merger if HBI was able to remain in the programming business "in some capacity."  (*Id.*

at 32.)

Representatives of Hughes and USSB met at the Chicago O'Hare Hilton in

November 1998 to discuss possible terms of the merger and a long-term programming

agreement.  (McElroy Decl. I ¶ 7, Ex. 5 at DTV000020.)  The parties agreed that

DIRECTV would give HBI a distribution right for up to three networks on DIRECTV's

platform.  (S.E. Hubbard at 23.)  The length of HBI's distribution rights, however,

remained in dispute and was given significant consideration.  (McElroy Decl. I ¶ 7, Ex. 5

at DTV000022-27.)  HBI proposed that the right to distribute should last in "perpetuity."

(*Id.* at DTV000026.)  DIRECTV proposed that HBI's right to distribute be limited to

seven years, but indicated that it was "willing to give something more."  (*Id.*; McElroy

Decl. II ¶ 6, Ex. 4 at DTV000013.)

Subsequent drafts of the PPA show that DIRECTV initially proposed that HBI's

distribution rights be limited to seven years (McElroy Decl. II ¶ 8, Ex. 6 at HB0017269),

and that HBI countered with a proposal that eliminated the seven-year term and, instead,

suggested that the rights be granted "on an ongoing basis."  (McElroy II ¶ 9, Ex. 7 at

DTV000037.)  A draft dated December 8, 1998, includes no provision for a seven-year period; rather, the draft proposes that HBI have a "right to distribute" three channels "owned and controlled" by the Hubbard family.  (*Id.* ¶ 10, Ex. 8 at HB0015447-48.)  Finally, a draft sent to HBI from DIRECTV on December 11, 1998, similarly does not contain a seven-year term provision, and grants HBI a "right to distribute" three channels that meet certain criteria and that are "owned and controlled" by the Hubbard family and their "lineal descendants."  (*Id.* ¶ 11, Ex. 9.)

USSB and Hughes completed the merger in 1999.  (S.E. Hubbard Decl. ¶ 5; PPA at 1.)  The negotiations regarding a long-term programming agreement were reduced to writing in the PPA, which provides, in relevant part:

> Concurrent with the execution of this [PPA], [Hughes] and [USSB] have executed an Agreement and Plan of Merger (the "Merger Agreement") which provides for the merger of USSB into Hughes, subject to the terms and conditions of the Merger Agreement.

> In connection with the parties' discussions and negotiations relative to the Merger Agreement, it was agreed that, concurrent with the consummation of the Merger Agreement (the "Closing"), [Hubbard] would be a "Preferred Programming Provider" to [DIRECTV].  The purpose of this letter is to set forth the parties' understandings relative to Hubbard's status as a Preferred Programming Provider, and the parties' rights and obligations attendant thereto.

> 1.  Preferred Programming Provider Status.

> (a)    The Hubbard Channels.  In respect of Hubbard's status as a Preferred Programming Provider, [DIRECTV] hereby grants to Hubbard (subject to the terms and conditions of the affiliation agreements to be negotiated in accordance with the provisions hereof) the *right to distribute* via the high-power direct broadcast satellite platform owned and operated by Distributor in the United States ("Distributor's Platform"), *three distinct television networks . . . which meet the criteria ("Hubbard Channel*

5

*Programming Criteria"*) set forth in subsections (i) and (ii) below (the "Hubbard Channels") on a Preferred Programming Provider basis, all as more fully discussed herein.

(i)      Except as may be otherwise agreed between the parties, it is agreed that *each Hubbard Channel must at all times during the term of the respective affiliation agreements be Owned and Controlled by the Hubbard Family, which includes* . . . their current and future immediate family members (i.e., children and spouses) *and lineal descendants*. . . . ; and

(ii)      Except as may be otherwise agreed between the parties, it is fully agreed (A) that the Hubbard Channels must be compatible with the other television networks and program offerings available via Distributor's Platform in Distributor's reasonable and good faith judgment at the time of launch and negotiation of any renewal or extension of the subject affiliation agreement(s); (B) that all affiliation agreements relative to distribution of the Hubbard Channels shall in all cases reflect terms and conditions (including, e.g., license fees, duration, marketing, packaging and promotion) that are commercially reasonable . . . ; (C) that all affiliation agreements relative to the Hubbard Channels shall in all cases reflect terms and conditions comparable to the terms and conditions for that of comparable cable networks distributed via Distributor's Platform; (D) that all affiliation agreements relative to the Hubbard Channels shall provide for marketing, packaging and positioning as favorable as that for comparable cable networks distributed via Distributor's Platform . . . .

(PPA §§ 1(a)(i) & (ii) (emphasis added).)  In addition, the PPA provides that "[t]his Agreement is for the benefit of the Hubbard Family and not for the benefit of any third party and the parties expressly agree that there are no express or implied third party beneficiaries to [the PPA] . . . and the rights and obligations embodied herein . . . are not assignable by Hubbard."  (*Id*. at § 3(c).)

The PPA also contemplates that the affiliation agreements should include a provision regarding their possible extension or renewal:

> [A]ll affiliation agreements relative to the Hubbard Channels shall include a provision for possible extension and/or renewal such that, for a period no less than six months before the expiration of the term of such agreement(s), the parties shall negotiate in *good faith for a mutually agreeable extension and /or renewal of the term for the continued distribution of the Hubbard Channels or possible replacement channels meeting the criteria set forth in this Section 1(a)*, and that if, in the reasonable business judgment of Distributor, at the end of the term of any affiliation agreement, such Hubbard Channel being so distributed does not satisfy the Hubbard Channel Programming Criteria, then, at Hubbard's option, the parties shall negotiate for distribution of a new channel that meets the Hubbard Channel Programming Criteria.

(PPA § 1(a)(ii)(E) (emphasis added).)  The PPA sets forth standards for negotiating renewal, extension, or replacement of existing HBI channels via the affiliation agreements.  (*Id*. § 1(a)(ii).)  For example, the PPA provides that the affiliation agreements are to "reflect terms and conditions (including, e.g., license fees, duration, marketing, packaging and promotion) that are commercially reasonable" and to "reflect terms and conditions comparable to the terms and conditions for that of comparable cable networks distributed via [DIRECTV's] Platform."  (*Id*. § 1(a)(ii)(B)-(C).)  The PPA also requires that DIRECTV consider in good faith, on an ongoing basis, any "additional program offerings (e.g. channels, series, events and specials)" that HBI might present for potential carriage.  (*Id*. § 1(b).)

Finally, in the PPA, the parties agreed that "no terms of any executed affiliation agreement contemplated by [the PPA] shall be deemed to be an amendment of [the PPA] unless expressly stated in a separate instrument signed by the parties."  (*Id*. § 3(e).)

HBI's first network, the All News Channel ("ANC"), was distributed on USSB prior to the merger.  On May 20, 1999, HBI and DIRECTV executed an affiliation

agreement for the distribution of ANC via DIRECTV's platform.  (McElroy Decl. I ¶ 13,

Ex. 11 ("ANC Affiliation Agreement").)  The PPA specifically provides that the ANC

Affiliation Agreement complies with the provision of Section 1 of the PPA.  (PPA

§ 2(a).)  In 2002, HBI agreed to terminate carriage of ANC on DIRECTV.  (McElroy

Decl. I ¶ 14, Ex. 12.)  Thus, Hubbard was left with the right under the PPA to broadcast

*two* channels on DIRECTV.

In 2006, HBI launched REELZChannel, LLC (originally known as Moviewatch).

(FAC ¶ 50.)  Also in 2006, HBI launched Ovation, the Arts Network.  (Doc. No. 85

("Hulse Decl.") ¶ 5, Ex. 3.)  HBI and DIRECTV negotiated affiliation agreements for

both REELZ and Ovation.  (Hulse Decl. ¶ 4, Ex. 2 ("REELZ Affiliation Agreement"); *id*.

¶ 5, Ex. 3 ("Ovation Affiliation Agreement").)  The REELZ Affiliation Agreement

contains a "Term; Extension" provision:

> The term of this Agreement shall be for the period commencing on the date
> hereof and ending on the seventh anniversary of the Service Launch Date
> (the "Term"); provided, that, the parties agree that not less than
> six (6) months prior to the end of the Term, the parties shall initiate good
> faith negotiations with respect to an extension of the Term for a mutually
> agreeable period and on mutually agreeable terms and conditions, with such
> negotiation to continue for a period of at least ninety (90) days.  In the
> event the parties are unable to reach mutually agreeable terms and
> conditions, this Agreement shall terminate on the seventh anniversary of
> the Service Launch Date.  Both parties shall have performed their
> obligations hereunder by engaging in good faith negotiations even if no
> extension is agreed upon.

(REELZ Affiliation Agreement § 6(a) (emphasis in original).)  The REELZ Affiliation

Agreement also provides:

> Notwithstanding anything to the contrary herein, the parties acknowledge
> that upon their execution of this Agreement, the Service shall constitute the

second Hubbard Channel (as defined in the [PPA]) and Hubbard shall have the right to request carriage by Affiliate for one more Hubbard Channel (i.e. the third Hubbard Channel) pursuant and subject to the terms of the [PPA], provided further that nothing in this Section 6(f) shall be deemed to modify either parties' rights under the [PPA] except as this Section 6(f) clarifies Section 2(b) of the [PPA].

(*Id.* ¶ 6(f).)

The Ovation Affiliation Agreement contains the following relevant provisions:

1. Term; Grant of Rights.

    1.1.    Term; Extension; Service Commencement Date.  The term of this Agreement shall be for the period commencing on the date hereof and ending on the sixth anniversary of the Service Commencement Date (the "**Term**").  The "**Service Commencement Date**" means the date on which Affiliate commences distribution of the Service over a DTH Satellite for revenue-generating purposes, which date shall be within sixty (60) days after Affiliate's next satellite is successfully launched and operational . . . . Affiliate shall give Programmer at least forth-five (45) days notice of the Service Commencement Date. . . .

    6.6     Notwithstanding anything herein to the contrary, the parties acknowledge that upon the execution and delivery of this Agreement by both parties hereto, the Service shall constitute the third and final Hubbard Channel (as defined in the [PPA]), and Hubbard shall have no further right to request carriage by Affiliate of any additional Hubbard Channels pursuant to the terms of the [PPA]; provided that nothing in this Section 6.6 shall be deemed to modify either parties' rights under the [PPA], except as this Section 6.6 clarifies Section 2(b) of the [PPA]. . . .

(Ovation Affiliation Agreement §§ 1.1, 6.6 (emphasis in original).)[4]

During the negotiation of the Ovation Affiliation Agreement, the parties discussed

the "Hubbard ownership and control" portion of the PPA, specifically in relation to

---

[4]     Section 2(b) of the PPA pertains to the "Launch and Carriage" of the Hubbard Channels.

DIRECTV's concern that HBI not be able to sell a programming slot "to someone like ESPN." (McElroy Decl. I ¶ 15, Ex. 13 at HB0001217.) In addition, during negotiations, DIRECTV's Vice President of Programming Acquisition acknowledged the "extraordinary" value of HBI's "right to distribute" under the PPA. (*Id.* ¶ 16, Ex. 14 at HB0017434.)

When HBI's networks (REELZChannel and Ovation) were up for their first renewal, the parties engaged in renewal discussions but were unable to reach any agreements. HBI asserts that it made numerous proposals to DIRECTV for the renewal of the REELZChannel and Ovation that were commercially reasonable and reflected the terms and conditions comparable to those of comparable cable networks. (S.E. Hubbard Decl. ¶ 40; McElroy Decl. I ¶ 18, Ex. 16 ("Second S.E. Hubbard Decl.") ¶¶ 5-6; McElroy Decl. I ¶ 19, Ex. 17 ("Second deGarmo, Jr. Decl.") ¶¶ 6-18.) HBI claims that DIRECTV rejected these offers and failed to make any commercially reasonable offers in return. HBI further submits that DIRECTV simply refused to negotiate under the PPA and, instead, told HBI that the PPA was "no longer valid." (S.E. Hubbard Dep. at 203-04.) Further, HBI claims that in September 2013, DIRECTV stated that it planned to take REELZChannel off the air. (S.E. Hubbard Decl. ¶¶ 42-43.)

On September 26, 2013, HBI filed a Complaint against DIRECTV, asserting claims for breach of contract and declaratory relief and seeking damages, specific performance, and injunctive relief. (Doc. No. 1, Compl.) At the same time, HBI filed a motion for a temporary restraining order and preliminary injunction. (Doc. No. 6.) The parties engaged in mediation before Magistrate Judge Arthur J. Boylan. On October 24,

2013, the parties agreed to, and Magistrate Judge Boylan ordered, expedited discovery and briefing on the limited issue of the "nature, force and continued effect of the PPA." (Doc. No. 45.)  The parties also agreed to maintain the status quo "throughout the pendency of [the Court's] ruling on this motion and throughout the 21-day period following that."  (*Id.*) [5]

On December 6, 2013, HBI filed its First Amended Complaint ("FAC"), asserting the following causes of action against DIRECTV:  (1) Declaratory Relief; (2) Breach of Contract; (3) Promissory Estoppel; (4) Negligent Misrepresentation; and (5) Breach of Implied Covenant of Good Faith and Fair Dealing.  (FAC ¶¶ 82-115.)  Currently before the Court are several motions that put before the Court the issue of the "nature, force and continued effect of the PPA."[6]

---

[5]     Thereafter, the case was reassigned to Magistrate Judge Jeanne J. Graham.  (Doc. No. 51.)

[6]     The parties agreed to first file briefs addressing the meaning of the PPA.  (Doc. No. 45.)  The parties' dispute over the interpretation of the PPA has been simultaneously briefed in the parties' cross-motions for summary judgment.  The Court will address the meaning of the PPA in this Order.  However, despite the agreement to limit these proceedings to the dispute over the interpretation of the PPA, DIRECTV has also filed a Motion to Stay Proceedings Pending Arbitration and to Compel Arbitration (Doc. No. 52) and a Motion to Dismiss (Doc. No. 82).  These motions raise issues that go beyond the agreed upon scope of the proceedings, which were to be limited to the "nature, force, and continued effect of" the PPA.  The Court finds that the most efficient course is to decline to consider, at this time, arguments made in support of DIRECTV's motion to dismiss and motion to stay that go beyond the interpretation of the PPA.  Should DIRECTV decide, in the future, to re-file these motions, it may do so without prejudice and with calendar priority.

## DISCUSSION

### I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d at 747.  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### II.     Contract Interpretation

Under California law, contract interpretation is a question of law.  *SDR Capital Mgmt., Inc. v. Am. Int'l Specialty Ins. Co.*, 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004).

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties. *See State Farm Gen. Ins. Co. v. Mintarsih*, 95 Cal. Rptr. 3d 845, 852 (Ct. App. 2009); *see also* Cal. Civ. Code § 1636 (goal of contract interpretation is "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful").

"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 135 Cal. Rptr. 2d 505, 513 (Ct. App. 2003). While the parties' intention is generally determined from the written contract, courts also consider the circumstances under which the contract was formed and the matter to which the contract relates. *Mintarsih*, 95 Cal. Rptr. 3d at 852; *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 80 Cal. Rptr. 2d 329, 349 (Ct. App. 1998) ("The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent acts and conduct of the parties.") (citations omitted).

In interpreting the contract, the court determines whether the contract is ambiguous. *See Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995). "A contract provision is considered ambiguous when the provision is susceptible to more than one

reasonable interpretation." *SDR Capital Mgmt.*, 320 F. Supp. 2d at 1046 (citation

omitted).  Under California law, a party may submit extrinsic evidence in support of its

proposed reading of a contract, even where the party contends that the contract is

unambiguous.  *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (Cal. 2006).  "The

test of admissibility of extrinsic evidence to explain the meaning of a written instrument

is not whether it appears to the court to be plain and unambiguous on its face, but whether

the offered evidence is relevant to prove a meaning to which the language of the

instrument is reasonably susceptible."  *Id.*

## III.    The PPA

The parties dispute the nature, force and effect of the PPA.  HBI seeks an order on

Count I (a)-(d) and (f)-(g) of its FAC, declaring that:  the PPA remains in effect and is

enforceable; the PPA grants HBI the ongoing right to maintain two channels on the

DIRECTV platform, so long as the channels meet the Hubbard Channel Programming

Criteria; the PPA applies to "all affiliation agreements" negotiated for the Hubbard

Channels, including renewal affiliation agreements; the PPA requires the parties to

negotiate in good faith for a mutually agreeable extension and/or renewal of each

affiliation agreement; and to comply with the obligation to negotiate in good faith under

the PPA, the parties agreed to negotiate terms and conditions that were commercially

reasonable and that were comparable to the terms and conditions for comparable

networks distributed via DIRECTV's platform.  (Doc. No. 101 at 20.)

DIRECTV contends that the PPA does not impose the above limitations on

DIRECTV.  In particular, DIRECTV asserts that:  none of the contract provisions of the

PPA can plausibly be read to provide for a distribution right guaranteed to last generations; HBI's reading of the PPA is unsupportable under California law; and the extrinsic evidence upon which HBI relies is disputed. Instead, DIRECTV contends that the language of the PPA is reasonably susceptible to only one interpretation—that the right to distribute three channels on the DIRECTV platform granted to HBI is "subject to the terms and conditions of the affiliation agreements" to be negotiated, and that once the affiliation agreements expired by their own terms, nothing in the PPA required their renewal. (Doc. No. 92 at 1-2.) Thus, DIRECTV moves for summary judgment on HBI's breach of contract and declaratory relief claims.

There is no dispute that the PPA contemplated that DIRECTV would distribute three distinct television networks that meet the Hubbard Channel Programming Criteria—including the requirement that each Hubbard Channel be owned and controlled by the Hubbard Family.[7]  Specifically, the PPA provides:

> In respect of Hubbard's status as a Preferred Programming Provider, [DIRECTV] hereby grants to Hubbard (subject to the terms and conditions of the affiliation agreements to be negotiated in accordance with the provisions hereof) the *right to distribute* via the . . . Distributor's Platform . . . *three distinct television networks . . . which meet . . . Hubbard Channel Programming Criteria . . .*  set forth in subsections (i) and (ii) below . . . on a Preferred Programming Provider basis, all as more fully discussed herein.

(PPA § 1(a) (emphasis added).)  The parties do, however, dispute whether and to what

---

[7]     The parties agreed to terminate HBI's right to distribute one channel, and therefore there is no dispute that only the right to distribute the two remaining channels, REELZChannel and Ovation, is at issue here.

extent the PPA imposes obligations on DIRECTV regarding HBI's rights to distribute networks.  The Court considers the parties' competing interpretations of the PPA below.

HBI contends that the PPA, on its face, grants HBI a "right to distribute" those networks on DIRECTV's platform that is long-term and continuous and that this right continues for as long as its networks meet the Hubbard Channel Programming Criteria, including the requirement that each channel be owned and controlled by the Hubbard Family (which includes lineal descendants).  HBI also contends that extrinsic evidence confirms the long-term and continuing nature of HBI's distribution rights.  With respect to the obligations under the PPA related to affiliation agreements, HBI submits that the PPA requires:  (1) the renewal of the affiliation agreements to carry out the long-term distribution rights; and (2) good-faith negotiation (according to objective standards) of the affiliation agreements in order to set forth the specific terms and conditions of carriage for the Hubbard Channels.

DIRECTV, on the other hand, contends that the rights and obligations in the PPA clearly and unambiguously provide HBI with a right to distribute "subject to the terms and conditions of the affiliation agreements to be negotiated."  (PPA § 1(a).)  DIRECTV maintains that the PPA sets out certain guidelines for provisions that should be included in an affiliation agreement, including a commercially reasonable duration and a provision for good faith negotiation of a *possible* renewal.  (PPA § 1(a)(ii).)  Further, according to DIRECTV, it agreed that the first Hubbard Channel would be ANC, and that it would enter into affiliation agreements for the remaining two channels.  (*Id*. § 2(b).)  DIRECTV contends that the PPA contains no other obligations with respect to the Hubbard

Channels.  In support, DIRECTV points out that the affiliation agreements contain term

provisions and submits that the parties contemplated that they may be unable to reach

mutually-agreeable renewal terms.  DIRECTV further contends that it is entitled to

summary judgment because the PPA contains no obligation on DIRECTV's part to

extend or renew any affiliation agreement, and that it met its obligations under the PPA

by entering into the three affiliation agreements and distributing the channels during their

terms accordingly.

### A.    Continuous Nature of the PPA

Applying the rules of contract interpretation noted above, the Court concludes that

the PPA unambiguously establishes that HBI's right to distribute its networks on

DIRECTV's platform is a continuous right that lasts for as long as HBI's networks

continue to meet the Hubbard Channel Programming Criteria (including that the channels

be owned and controlled by the Hubbard Family, including its lineal descendants).

First, the plain language of the PPA distinguishes between the right to

"distribution" and the right to "launch."  As to the right to distribution, the PPA provides:

"[DIRECTV] hereby grants to Hubbard (subject to the terms of the affiliation agreements

to be negotiated . . .) the right to distribute . . . three distinct television networks."  (PPA

§ 1(a).)  In contrast, the PPA also contains a provision addressing the launch and carriage

of Hubbard channels, specifically providing that HBI "shall have a period of

seven (7) years from the Closing to make available second and third Hubbard Channels,

in which case the parties shall promptly enter into good faith discussions and negotiations

concerning their entering into affiliation agreements therefor."  (*Id*. § 2(b)(i).)  This

seven-year period applies specifically to the launch of the second and third channels.  The

PPA does not contain a similar time provision related to HBI's distribution rights.

Indeed, the PPA does not place a time limit on the distribution rights.  This distinction

between the distribution (with no term limit) and the launch of HBI's channels

(seven-year term) strongly suggests that the parties did not intend for the distribution

rights to be limited.

Moreover, when read in the context of the parties' entire agreement, the term

"distribution" clearly refers to the continuous availability of a channel to subscribers.

The PPA unambiguously establishes that HBI's right to the "distribution" of its channels

on DIRECTV's platform lasts for as long as the networks continue to meet the Hubbard

Channel Programming Criteria (including the requirement that the channels be owned

and controlled by the Hubbard family, including its lineal descendants).  (*Id*. § 1(a)(i).)

That the right to distribute is continuous in nature not only serves an overarching

purpose of the PPA (to ensure HBI's presence in the programming business for

generations), it is also supported by the extrinsic evidence relating to the circumstances

surrounding the merger negotiations and the execution of the PPA.  For example, as laid

out in the background discussion above, there is evidence that during the merger

negotiations, HBI indicated that it would not agree to a merger without a guarantee that

the HBI family could remain in the satellite television business for the long-term.

(McElroy Decl. I ¶ 6, Ex. 4 at DTV 000013; S.E. Hubbard Dep. at 200.)  That HBI

wanted a long-term deal is reflected in DIRECTV's own documents.  (McElroy Decl. I

¶ 6, Ex. 4 at DTV000013; *id.* ¶ 7, Ex. 5 at DTV000020.)  Indeed, Hartenstein

acknowledged in his deposition that he understood that HBI "wanted to have generations of Hubbards [to] have the right to participate." (Hartenstein Dep. at 87.)

The record also demonstrates that the parties spent significant time debating the length of the distribution right. The evidence shows that HBI wanted perpetual rights, that DIRECTV proposed a seven-year term, and that the parties compromised by agreeing that HBI's right to distribute would be "an ongoing right for the Hubbard family" and that the right to distribute would last as long as the networks met the Hubbard Channel Programming Criteria (including the requirement that the channels are owned and controlled by the Hubbard Family, including its lineal descendants). This compromise gave HBI long-term distribution rights with the generational aspect that HBI desired, but also limited those rights in that HBI could not sell the rights to a large conglomerate.

Finally, a review of the drafts of the PPA exchanged by the parties shows the evolving nature of the PPA, namely that HBI rejected a seven-year term and that the parties compromised with respect to the ongoing nature of the PPA. Specifically, on November 25, 1998, DIRECTV proposed a term sheet that limited HBI's distribution rights to a seven-year period. (McElroy Decl. I ¶ 9, Ex. 7 at HB0017269 ("HBI will have a right, for a period of seven years following the closing, to carriage agreements . . .").) HBI struck the seven-year limitation in its response. (*Id*. ¶ 10, Ex. 8 at DTV000037.) Subsequent drafts of the PPA dated, respectively, December 8 and December 11, 1998, do not contain the seven-year term limit with respect to distribution rights. (*Id*. ¶¶ 11, 12, Exs. 9, 10.) These drafts, instead, contain a "right to distribute" three channels via

DIRECTV's platform, provided that those channels be "owned and controlled" by the Hubbard family and meet other programming conditions.  (*Id.*)

### B.    Affiliation Agreements

DIRECTV argues that HBI's distribution rights are subject to the "terms and conditions of the affiliation agreements to be negotiated" and that the parties could agree to different terms via the affiliation agreements.  Specifically, DIRECTV claims that the distribution rights, including term length, were to be negotiated via the affiliation agreements.  DIRECTV points out that the ANC Affiliation Agreement expressly contemplated that HBI and DIRECTV may not come to an agreement on extension or renewal (ANC Affiliation Agreement § 6(a)(ii)), and that the PPA acknowledges that the ANC Affiliation Agreement complies with the PPA (PPA § 2(a)).

The Court disagrees with DIRECTV to the extent that DIRECTV contends that the affiliation agreements could alter the term of HBI's distribution rights.  Instead, the purpose of the affiliation agreements was to implement the PPA, not limit the rights granted by the PPA.  First, the PPA explicitly provides that "no terms of any executed affiliation agreement shall be deemed to be an amendment of" the PPA.  (*Id.* § 3(e).)  Therefore, it would be improper to read into the PPA any term provision on distribution rights contained in an affiliation agreement.  Notably, the PPA does not contain a calendar term limit on HBI's distribution rights.  Instead, it provides HBI with a right to distribute three networks on DIRECTV's platform as long as the networks meet the Hubbard Channel Programming Criteria.  (*Id.* §§ 1(a)-1(a)(i).)  Accordingly, the Court

declines to read the affiliation agreements so as to impose a time limitation on HBI's right to distribute under the PPA.

In addition, the term provisions contained in the affiliation agreements are consistent with the long-term nature of the PPA. While the PPA envisions a long-term agreement, as discussed above, the affiliation agreements govern the specific business terms for distribution of the Hubbard networks. The affiliation agreements, in effect, are mechanisms that allow for the parties to periodically revisit the economic and other terms between HBI and DIRECTV. Indeed, the PPA requires the negotiation of affiliation agreements to set forth the specific terms and conditions of carriage, and the periodic negotiation allows the parties to carry out HBI's long-term distribution rights while, at the same time, ensuring that the specific terms reflect current conditions. That the affiliation agreements are separate contracts that are not intended to supplant HBI's distribution rights under the PPA is underscored by the fact that the affiliation agreements contain language emphasizing that the PPA remains in full effect. (REELZChannel Affiliation Agreement § 13; Ovation Affiliation Agreement § 6.6.)

The PPA also sets forth objective standards for the affiliation agreements and how they are to be negotiated. (PPA § 1(a)(ii).) In short, terms and conditions of the affiliation agreements must be commercially reasonable, comparable to the terms and conditions for comparable networks on DIRECTV's platform, provide marketing as favorable as that for comparable networks, and provide a provision for possible extension or renewal. Finally, the PPA provides that the parties must negotiate in good faith for a

mutually agreeable extension or renewal of each HBI network, along with a process for

doing so.  (*Id.*)  Specifically,

> all affiliation agreements relative to the Hubbard Channels shall include a
> provision for possible extension and/or renewal such that, for a period no
> less than six months before the expiration of the term of such agreement(s),
> the parties shall negotiate in good faith for a mutually agreeable extension
> and/or renewal of the term for the continued distribution of the Hubbard
> Channels or possible replacement channels meeting the criteria set forth in
> this Section 1(a). . . .

(*Id.* § 1(a)(ii)(E).)  If a channel fails to continue to meet the Hubbard Channel

Programming Criteria, HBI has the option of identifying a new channel that meets the

criteria forward for negotiation:

> [I]f, in the reasonable business judgment of Distributor, at the end of the
> term of any affiliation agreement, such Hubbard Channel being so
> distributed does not satisfy the Hubbard Channel Programming Criteria,
> then, at Hubbard's option, the parties shall negotiate for distribution of a
> new channel that meets the Hubbard Channel Programming Criteria.

(*Id.*)  Reading the parties' agreement as a whole, if the parties abide by the PPA's

renewal framework by negotiating as set forth in Section 1(a)(ii)(E), and the Hubbard

Channels continue to meet the Hubbard Channel Criteria (including that the relevant HBI

channel is owned by the Hubbard family, including its lineal descendants), then the

parties intended for their relationship to be renewed or extended, provided that they could

come to a mutually agreeable extension or renewal via good faith negotiations.

## IV.    Conclusion

Consistent with the Court's reasoning above, the Court grants HBI's Motion for

Summary Judgment on Count I (a)-(d) and (f)-(g), and declares that:  (1) the PPA remains

in effect and is enforceable; (2) the PPA grants HBI the right to maintain two channels on

the DIRECTV platform, so long as the channels meet the Hubbard Channel Programming Criteria; (3) the PPA applies to all affiliation agreements negotiated for the Hubbard Channels, including renewal affiliation agreements; (4) the PPA requires the parties to negotiate in good faith for a mutually agreeable extension and/or renewal of each affiliation agreement; and (5) to comply with the obligation to negotiate in good faith under the PPA, the parties agreed to negotiate terms and conditions that are commercially reasonable and that are comparable to the terms and conditions for comparable networks distributed via DIRECTV's platform.

Also as discussed above, the parties agreed to limit the present motion to a determination on the judgment of the nature, force, and continued effect of the PPA.  In light of the Court's decision above, the Court notes that questions such as whether or not DIRECTV has met its obligation to negotiate in good faith will be addressed during the next phase of this litigation.

## V.    Status Quo

During mediation, the parties agreed to maintain the status quo "throughout the pendency of [the Court's] ruling on this motion and throughout the 21-day period following that."  (Doc. No. 45.)  HBI now requests that the Court order the parties to maintain the status quo until the litigation is resolved.  The Court agrees that maintenance of the status quo for some period would be beneficial, however, absent full consideration of a motion for injunctive relief, the Court cannot extend the period during which the parties must maintain the status quo.  With that in mind, the parties are encouraged to contact the Chambers of Magistrate Judge Jeanne J. Graham to attempt to settle this case,

and are also encouraged, if necessary, to stipulate to an extended period during which the status quo is maintained. Should the period of twenty-one days be insufficient, and the parties are unable to stipulate to an extended period, the Court will entertain a motion by HBI to request a continued period to maintain the status quo during the pendency of this litigation.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     HBI's Motion for Partial Summary Judgment (Doc. No. [99]) is **GRANTED**. HBI is entitled to summary judgment on Count I of Hubbard's First Amended Complaint, seeking Declaratory Judgment on paragraphs (a)-(d) and (f)-(g);

2.     DIRECTV's Motion for Summary Judgment on HBI's Breach of Contract and Declaratory Relief Claims (Doc. No. [90]) is **DENIED**;

3.     DIRECTV's Motion to Stay Proceedings Pending Arbitration and to Compel Arbitration of HBI's Breach Claims Related to REELZ (Doc. No. [52]) is **DENIED WITHOUT PREJUDICE**; and

4.     DIRECTV's Motion to Dismiss HBI's First Amended Complaint (Doc. No. [82]) is **DENIED WITHOUT PREJUDICE**.


Dated:  June 12, 2014                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge